# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF NORTH CAROLINA

DENISE BRAHAM, KARLA PUCKETT, DEVONNA HOBBIE, and KIMBERLY LAWTON, individually and as representatives of a class of participants and beneficiaries on behalf of the LABORATORY CORPORATION OF AMERICA HOLDINGS GROUP BENEFITS PLAN,

*Plaintiffs*,

v.

LABORATORY CORPORATION OF AMERICA HOLDINGS, WILLIS TOWERS WATSON US LLC, and JOHN DOES 1–20,

*Defendants*.

No. 1:26-cv-00455-TDS-JGM

**CLASS ACTION COMPLAINT**
JURY TRIAL DEMANDED

## FIRST AMENDED COMPLAINT

1.  Plaintiffs Denise Braham, Karla Puckett, DeVonna Hobbie, and Kimberly Lawton ("Plaintiffs"), individually and as representatives of a class of similarly situated participants and beneficiaries of the Laboratory Corporation of America Holdings Group Benefits Plan (the "Plan"), bring this action under 29 U.S.C. § 1132(a)(2) and (a)(3) against Laboratory Corporation of America Holdings ("Labcorp"), Willis Towers Watson US LLC ("WTW"), and John Does 1–20 (collectively, "Defendants") for breaches of fiduciary duties and other violations of the Employee Retirement Income Security Act of 1974 ("ERISA").

1

2.      This case concerns Defendants' violations of ERISA-imposed duties with respect to the management and administration of the accident, critical illness, and hospital indemnity insurance programs ("Voluntary Benefits Insurance") provided through a plan governed by ERISA.

3.      Plaintiffs allege that Labcorp's failures to exercise reasonable diligence in the administration of the Plan—including failures to monitor, negotiate, and ensure prudent and reasonable carrier selection, broker commissions, and loss ratios for the Voluntary Benefits Insurance—caused Plaintiffs as participants of the Plan to pay excessive and unreasonable premiums.

4.      Labcorp and WTW engaged in a self-dealing arrangement in which WTW, consistent with its regular business practice, reduced Labcorp's bills for other WTW services in exchange for Labcorp allowing WTW to receive excessive commissions embedded in employees' premiums for Voluntary Benefits Insurance.

5.      Plaintiffs alternatively allege that if WTW is not a fiduciary, it is liable for disgorgement and other equitable relief as a party-in-interest that knowingly participated in Labcorp's ERISA violations.

6.      ERISA imposes strict standards on fiduciaries of employer-sponsored benefit plans—duties that are the "highest known to the law." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). Fiduciaries must act prudently and loyally, "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

7.      The marketplace for insurance and related services for employer-sponsored welfare plans is established and competitive. Very large plans that cover thousands of individuals, like the Plan, have tremendous bargaining power to obtain the best pricing without sacrificing service quality. Instead of using the Plan's bargaining power to negotiate prudent and reasonable fees, Defendants allowed unreasonable expenses to be charged to participants for their Voluntary Benefits Insurance, including by failing to monitor and control the commission fees received by the Plan's broker, WTW, which similarly situated prudent fiduciaries would have reduced or eliminated.

8.      To remedy Defendants' violations of ERISA, Plaintiffs bring this action on behalf of the Plan and a class of similarly situated participants under 29 U.S.C. § 1132(a)(2) and (3). Plaintiffs seek to recover all losses to the Plan resulting from Defendants' ERISA violations, to obtain disgorgement of all ill-gotten profits and Plan assets, and to obtain other appropriate equitable or remedial relief such as surcharge, restitution, an accounting, and injunctive relief to arrest ongoing and prevent future ERISA violations.

## JURISDICTION AND VENUE

9.      **Subject-matter jurisdiction**. This ERISA action under 29 U.S.C. § 1132(a)(2)–(3) is within the Court's federal-question jurisdiction under 28 U.S.C. § 1331, and can only be brought in federal court, 29 U.S.C. § 1132(e)(1).

10.     **Venue**. This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is a district where at least one of the

3

alleged breaches took place, where at least one Plaintiff resides, and where at least one Defendant resides or may be found.

11. **Standing**. Each Plaintiff has suffered injuries traceable to Defendants' conduct because they paid more for Voluntary Benefits Insurance than they would have but for the alleged misconduct. Further, as explained in detail below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed to harm and continued future losses. These injuries may be redressed by a judgment of this Court for monetary and injunctive relief.

## PARTIES

### I.     Plaintiffs

12. Denise Braham resides in South Holland, Illinois, and is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Ms. Braham began her employment with Labcorp in 2015. Ms. Braham worked as a phlebotomy supervisor, and as a participant of the Plan was enrolled in accident, critical illness, and hospital indemnity policies. Ms. Braham paid approximately $99.84 per year for accident insurance, $547.82 per year for critical illness insurance, and $205.14 per year for hospital indemnity insurance. Ms. Braham ended her employment with Labcorp in 2025. As described in more detail below, Ms. Braham overpaid for accident, critical illness, and hospital indemnity insurance because of Defendants' failure to negotiate the price of and monitor accident, critical illness, and hospital indemnity insurance.

4

13.     Karla Puckett resides in Grimesland, North Carolina, and was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Ms. Puckett began her employment with Labcorp in 1989. Ms. Puckett worked as an accounts receivable senior analyst, and as a participant of the Plan was enrolled in critical illness, accident, and hospital indemnity policies. Ms. Puckett paid approximately $269.10 per year for accident insurance, $538.72 per year for critical illness insurance, and $500.76 per year for hospital indemnity insurance. Ms. Puckett is no longer employed with Labcorp. As described in more detail below, Ms. Puckett overpaid for accident, critical illness, and hospital indemnity insurance because of Defendants' failure to negotiate the price of and monitor accident, critical illness, and hospital indemnity insurance.

14.     DeVonna Hobbie resides in Montgomery, Alabama, and was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Ms. Hobbie began her employment with Labcorp in 2013. Ms. Hobbie worked as a service representative, and as a participant of the Plan was enrolled in accident, critical illness, and hospital indemnity policies. Ms. Hobbie paid approximately $99.84 per year for accident insurance, $132.60 per year for critical illness insurance, and $205.14 per year for hospital indemnity insurance. Ms. Hobbie ended her employment with Labcorp in 2023. As described in more detail below, Ms. Hobbie overpaid for accident, critical illness, and hospital indemnity insurance because of Defendants' failure to negotiate the price of and monitor accident, critical illness, and hospital indemnity insurance.

5

15. Kimberly Lawton resides in Mansfield, Texas, and is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Ms. Lawton has been employed by Labcorp since 2013 and works as a patient service technician. As a participant of the Plan she enrolled in accident, critical illness, and hospital indemnity policies. Ms. Lawton pays approximately $99.84 per year for accident insurance, $223.86 per year for critical illness insurance, and $205.14 per year for hospital indemnity insurance. As described in more detail below, Ms. Lawton overpaid for accident, critical illness, and hospital indemnity insurance because of Defendants' failure to negotiate the price of and monitor accident, critical illness, and hospital indemnity insurance.

## II. Defendants

### A. Labcorp

16. Labcorp (NYSE: LH) is a publicly traded laboratory services company[1] organized under the laws of Delaware, with its principal place of business in Burlington, North Carolina.

17. As of December 31, 2024, Labcorp employed over 70,000 individuals and collected approximately $13 billion in revenue.

18. Labcorp is the Plan's sponsor under 29 U.S.C. § 1002(16)(B) and the Plan's administrator under 29 U.S.C. § 1002(16)(A).

---

[1] Labcorp is held by Labcorp Holdings Inc., which has no independent assets or operations, and sole ownership interest in Labcorp. Labcorp Holdings Inc. was formerly known as Laboratory Corporation of America Holdings.

6

19. Labcorp also is the named fiduciary of the Plan under 29 U.S.C. § 1102(a)(2).

20. Labcorp served in these roles throughout the class period.

21. In addition to controlling and managing the operation and administration of the Plan as a named fiduciary, Labcorp also acted as a fiduciary as defined by 29 U.S.C. § 1002(21)(A)(i) and (iii), by exercising discretionary authority or discretionary control over the administration and management of the Plan, exercising authority or control over the management or disposition of the Plan's assets, or having discretionary authority or discretionary responsibility in the administration of the Plan as alleged herein.

22. As the employer of the participants in the Plan and fiduciary of the Plan, Labcorp is a party in interest. 29 U.S.C. § 1002(14)(A) and (C).

23. John Does 1–20 are Labcorp's delegees who acted on Labcorp's behalf as named or functional fiduciaries as defined by 29 U.S.C. § 1002(21)(A).

B. <u>WTW</u>

24. WTW (Nasdaq: WTW) is a publicly traded, British-American insurance brokerage firm, with its principal place of business in the United States in Arlington, Virginia.

25. As of December 31, 2024, WTW had over 48,900 employees and collected $9.9 billion in revenue.

26. As alleged herein, WTW functioned as a fiduciary to the Plan as defined by 29 U.S.C. § 1002(21)(A), by exercising discretionary authority or discretionary control

7

over the administration and management of the Plan, exercising authority or control over the management or disposition of the Plan's assets, or having discretionary authority or discretionary responsibility in the administration of the Plan.

27. WTW frequently offers employers a quid pro quo in which the employer's bills for certain WTW services are reduced in exchange for the employer permitting excessive commissions to be embedded in employee premiums for supplemental insurance products.

28. The Plan's annual reports reveal such an arrangement here. Relative to the exorbitant commissions that WTW received in connection with Voluntary Benefits Insurance employees (over $14 million), the cost of which is fully paid by Labcorp employees, WTW received negligible commissions as broker for the traditional health insurance coverage for which Labcorp itself pays the bulk of the cost. Accordingly, Labcorp received improper benefits as a direct result of shifting WTW's costs to Labcorp employees in the form of excessive commissions included in Voluntary Benefits Insurance premiums.

29. As an entity providing services to the Plan, WTW is a party in interest. 29 U.S.C. § 1002(14)(B).

**ERISA'S FIDUCIARY STANDARDS**

30. ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

8

(A) for the exclusive purpose of:

> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

. . . [and]

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

31. Under ERISA, fiduciaries that exercise any authority or control over plan assets or the administration of a plan must act prudently and for the exclusive benefit of participants in the plan. Fiduciaries cannot act for their own benefit and must ensure that the amount of fees paid from plan assets is no more than reasonable. 29 U.S.C. § 1104(a)(1)(A)(ii); *see also* 29 U.S.C. § 1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

32. Supplementing these general fiduciary duties, certain transactions are prohibited *per se* by 29 U.S.C. § 1106 because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that the fiduciary

> shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

9

(A) sale or exchange, or leasing, of any property between the plan and a party in interest; [or]

…

(C) furnishing of goods, services, or facilities between the plan and party in interest; [or]

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

33.    Under 29 U.S.C. § 1106(b), fiduciaries are prohibited from engaging in self-dealing with Plan assets. Section 1106(b) provides that the fiduciary shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

34.    Section 1106(b) was "designed to prevent a trustee from being put into a position where he has dual loyalties and therefore he cannot act exclusively for the benefit of a plan's participants and beneficiaries." *Sinai Hosp. of Balt., Inc. v. Nat'l Ben. Fund for Hosp. & Health Care Emps.*, 697 F.2d 562, 566 (4th Cir. 1982); *see also* 29 C.F.R. § 2550.408b-2(e)(1).

35.    As further set forth in 29 C.F.R. § 2550.408b-2(e)(1):

These prohibitions are imposed upon fiduciaries to deter them from exercising the authority, control, or responsibility which makes such persons

10

fiduciaries when they have interests which may conflict with the interests of the plans for which they act. In such cases, the fiduciaries have interests in the transactions which may affect the exercise of their best judgment as fiduciaries.

36.    ERISA also imposes co-fiduciary liability upon plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part . . . , a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2)    if, by his failure to comply with section [1104(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## FACTS APPLICABLE TO ALL COUNTS

**I.  Voluntary Benefit Plans**

A.    <u>Overview</u>

37.    In addition to traditional welfare benefits like medical and disability insurance, many employers provide supplemental coverages such as accident, critical

11

illness, hospital indemnity, and cancer insurance that pay out a lump-sum or fixed amount for specific health-related events.[2]

38.    While employers usually subsidize premiums for traditional health insurance, the entire cost of these supplemental coverages is paid by employees through payroll deductions.

39.    Because medical costs are rising, voluntary benefits are often marketed as a way to close the gap between traditional health insurance coverage and additional medical costs incurred by participants.[3]

40.    Because the benefits are designed to address financial distress that may occur in the case of unexpected injuries, illnesses, and hospitalizations, the types of employees who typically purchase voluntary benefits, and those to whom the benefits are marketed, are often rank-and-file employees.

41.    While voluntary benefits have existed for decades, a recent study found a 27% increase in the number of employers offering voluntary benefits.[4]

---

[2] Cindy Goff, *Model 171 Benefits Overview: Presented to the NAIC Accident and Sickness Minimum Standards (B) Subgroup*, AMERICAN COUNCIL OF LIFE INSURERS, 8 (Sept. 20, 2021), https://content.naic.org/sites/default/files/call_materials/Supplemental%20Benefits%20Overview.pdf archived at https://perma.cc/RX89-6UC4.

[3] *Voluntary Benefits*, BAMBOOHR, https://www.bamboohr.com/resources/hr-glossary/voluntary-benefits (last visited Dec. 22, 2025) archived at https://perma.cc/2UV2-VZMV.

[4] Amanda Umpierrez, *More Employers Are Engaging With Voluntary Benefits*, PLANSPONSOR (Apr. 15, 2021), https://www.plansponsor.com/employers-engaging-voluntary-benefits/ archived at https://perma.cc/7TD9-3T78.

42.    In 2018, nearly one-third of eligible employees enrolled in voluntary benefits. "According to a study conducted by Eastbridge Consulting Group, the overall average participation rate increased from 21% in 2014 to 28% in 2017. Those rates have been increasing over the last two to three years, according to data from survey participants found in the 2017 'Voluntary Participation Rates Spotlight Report.'"[5]

43.    In 2021, nearly 60% of employers elected to offer four or more income protection or specialty products.[6]

44.    While the Secretary of Labor has issued a regulatory "safe harbor" exemption from ERISA requirements for certain voluntary benefit programs, 29 C.F.R. § 2510.3-1(j), the vast majority of such plans do not qualify for the safe harbor and are subject to ERISA, as is the Plan here.[7]

45.    Labcorp concedes in its annual reports filed with the Department of Labor ("DOL") and in the governing plan document that the Plan is subject to ERISA.

---

[5] Phil Albinus, *Voluntary enrollment rates rise 'higher than predicted,'* EMPLOYEE BENEFIT NEWS (Jan. 1, 2018), https://www.benefitnews.com/advisers/news/voluntary-enrollment-rates-rise-higher-than-predicted archived at https://perma.cc/6WY4-WK5H.

[6] Umpierrez, *More Employers Are Engaging With Voluntary Benefits*, *supra* note 4.

[7] *Worksite & voluntary benefits carry significant ERISA compliance risk*, COMPLIANCEBUG, https://www.compliancebug.com/voluntary-benefits-carry-significant-compliance-risk/ (last visited Aug. 7, 2025) archived at https://perma.cc/R7VU-W5FC.

B. <u>Role of Employers</u>

46. ERISA imposes fiduciary responsibilities with respect to the administration of voluntary benefit plans upon employers offering such plans.

47. An entity "is a fiduciary with respect to a plan" if it "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

48. Under ERISA, fiduciary duties of loyalty and prudence apply to the selection and retention of insurance providers and benefit administrators.

49. Under the prevailing fiduciary standard at all relevant times, prudent fiduciaries monitor *all* compensation received by plan service providers, because that is the only way to ensure those service providers are receiving only reasonable compensation for services to the plan.

50. This includes indirect compensation, which is "compensation received from *any source other than the covered plan*, the plan sponsor, the covered service provider, or an affiliate," such as compensation received from a third party like a mutual fund or an insurance company. 29 C.F.R. § 2550.408b-2(c)(viii)(B)(2) (emphasis added).

51. Accordingly, fiduciaries who select and monitor insurance programs, brokers, and carriers for ERISA-governed voluntary benefit plans must do so prudently and loyally, and refrain from self-dealing in connection with such selection and monitoring.

14

52.     As a factual matter, under the prevailing fiduciary standard at all relevant times, prudent fiduciaries of voluntary benefit programs have a regular process in place to review benefits, premiums, carriers, claims, and commissions, among other things, and to compare the fees the program charges to reasonable fees in the market, ensuring that plan service providers receive only reasonable compensation.

53.     It is especially important to investigate premiums, commissions, and brokerage fees to determine whether fees are reasonable in voluntary benefit plans because participants are paying the full cost.

54.     The higher the fees, commissions, and brokerage fees, the higher costs participants incur.

55.     Industry professionals advise employers that a prudent process for selecting and monitoring voluntary insurance products in an ERISA-governed plan includes, at minimum, regularly establishing that their service providers are competent, integrous, fairly priced, transparent, and accountable; monitoring and controlling premiums to ensure they remain reasonable for the benefits provided; monitoring the non-commission compensation received by brokers from carriers to determine the amount of additional fees brokers are receiving; issuing regular requests for competitive bids to assess available alternative insurance products and brokers; issuing regular requests for competitive bids to assess broker fees (if using a broker); regularly reviewing broker compensation; ensuring that brokers are not overselling product; ensuring that participant

15

claims requests are supported; and regularly reviewing loss ratios to ensure participants are receiving adequate value for their premiums.

56. Without such steps, employers "may not be fully aware of the proportion of dollars that are feeding profits to a benefits ecosystem – instead of contributing to the value of the benefits to their employees," and therefore must "conduct the due diligence that is necessary to understand where their employees' supplemental health plan dollars are going."[8]

57. Contrary to the prevailing fiduciary standard, some employers, like Labcorp, allow brokers to aggressively sell products to their employees that are unduly expensive and have low loss ratios, with carriers incentivized to systemically deny claims.

### C. Role of Brokers

58. No law requires private employers to use a middleman to shop or contract for a supplemental insurance program offered to their employees as a benefit of employment. The law does require fiduciaries to monitor their delegees, including the reasonableness of their compensation relative to the services performed.

59. Thus, if an employer-fiduciary of an ERISA-governed voluntary benefit program chooses to delegate to a broker plan administration tasks such as issuing requests for proposals and selecting insurance carriers, conducting enrollment, claims

---

[8] Heath Miller & Amy Hollis, *Blindsided: Are Supplemental Health Plans the next class action risk for plan sponsors?*, EMPLOYEES FIRST (June 2025).

assistance, and employee education, the employer has a duty to monitor those delegated tasks to ensure they are carried out consistently with fiduciary duties.

60.     A broker's primary role is to solicit bids and recommend or select a carrier. When the same carrier is retained year after year, the broker's workload typically decreases because the broker does not need to draft requests for proposals, vet potential new carriers, or switch participants from one system to another, for example. If the broker's compensation is not reduced accordingly, the broker's (possibly already excessive) compensation becomes disproportionate (or even more so) to the services performed.

61.     Once a carrier is retained, a broker may assist employees with enrolling in the supplemental insurance products. However, brokers usually outsource enrollment to third-party administrators, whose charges are as low as between \$4–10 per enrollee. Thus, commissions collected year after year, beyond the cost of paying a third-party administrator to conduct enrollment, are retained by the broker and disproportionate to the services performed.

62.     Insurance brokers have a financial incentive to maximize commissions.[9]

---

[9] Somer Anderson, *How Does an Insurance Broker Make Money?*, INVESTOPEDIA (Dec. 19, 2021), https://www.investopedia.com/ask/answers/050715/how-does-insurance-broker-make-money.asp ("The primary way that an insurance broker makes money is from commissions and fees earned on sold policies. These commissions are typically a percentage of the policy's total annual premium.") archived at https://perma.cc/YZ3B-QTB7.

63.     For example, Arthur J. Gallagher & Co., a large brokerage firm, reports that [its] "primary source of revenues for [its] brokerage services is commissions[.]"[10]

64.     Premiums consist of monies used to pay claims and monies used to pay administrative expenses.

65.     Brokers' commissions are considered administrative expenses, which are built into the premiums participants pay.[11]

66.     If the broker's commission is 40% of the participants' premiums, the premium rate must account for the fact that 40% of the total is earmarked to cover the cost of commissions.

67.     Commissions to brokers thus increase premiums dollar-for-dollar.

---

[10] *2024 Annual Report*, ARTHUR J. GALLAGHER & CO., https://s28.q4cdn.com/872121257/files/ doc_financials/2024/ar/ARTHUR-J-GALLAGHER-ARS.pdf (last visited Dec. 22, 2025) archived at https://perma.cc/2UFB-4S59.

[11] Task Force on Regulatory Filing of the Health Committee of the Actuarial Standards Board, *Actuarial Standard of Practice No. 8: Regulatory Filings for Health Benefits, Accident and Health Insurance for Entities Providing Health Benefits*, ACTUARIAL STANDARDS BOARD (Mar. 2014), https://www.actuarialstandardsboard.org/wp-content/uploads/2014/08/asop008_176.pdf ("Non-Benefit Expenses, Including but Not Limited to Administrative Expenses, Commissions, Broker Fees, and Taxes—The actuary should use appropriate methods and assumptions for calculating the non-benefit expenses component of premium rates.") archived at https://perma.cc/6X97-FRHS; *OGC Opinion No. 02-12-23*, NEW YORK STATE: DEPARTMENT OF FINANCIAL SERVICES, https://www.dfs.ny.gov/insurance/ogco2002/rg021223.htm (last visited Mar. 23, 2026) ("Commissions are part of an insurer's expenses. . . . [T]he expense portion of an insurer's rate must be included in support of its rate filings made with the Department.") archived at https://perma.cc/DWX7-65AQ.

18

68. Excessive commissions built into premiums are impermissible under ERISA.

69. For the Labcorp Plan, WTW's interest in maximizing its commissions is in direct conflict with that of participants, whose interest is in having the lowest fees from WTW, thereby reducing the premiums paid.

70. Thus, WTW, the broker recommending the insurance company, stood to benefit from recommending the company with the highest price, rather than the lowest price.

71. Brokers view voluntary benefits as a cash cow: "a quick fix for a stagnant book of steady, satisfied clients," and "commission . . . of an additional 15 percent to 55 percent, depending on the line of insurance offered." [12]

72. The only way an insurer can "afford to sell you something that is half commission" is by including the commission in the premium. [13]

73. To be clear, the cited range of commissions does not represent a reasonable fee for the brokerage services rendered.

---

[12] Dagny Taggart, *Volunteering for Trouble – The Compliance Traps, Administrative Nightmares, Subtle Discrediting & Employee Frustration Voluntary Benefits Often Bring*, BENEFIT REVOLUTION (Mar. 2023), https://www.benefit-revolution.com/2023/03/volunteering-for-trouble.html archived at https://perma.cc/A2P6-VWDL.

[13] *Id.*

19

74. To the contrary, brokers aggressively sell so-called "voluntary benefits" precisely *because* such plans yield commissions that are disproportionately high relative to the services rendered if the employer shirks its fiduciary monitoring duties, as here.

75. As a matter of industry practice, brokers performing the roles that WTW did with respect to Labcorp and the Plan exercise discretion in administering voluntary benefit plans, rendering them functional fiduciaries as defined by ERISA.

76. Voluntary benefit plan brokers, such as WTW, may screen the bids they receive from carriers, selectively presenting to the employer only a curated set of alternatives, removing from consideration options which the broker deems to provide an insufficient commission.

77. A broker that winnows the employer's choices down to only options where commissions are favorable to the broker unilaterally "exercises . . . discretionary authority or discretionary control respecting management of" the plan. 29 U.S.C. § 1002(21)(A)(i).

78. A broker likewise exercises fiduciary discretion by taking actions that effectively set its own compensation.

D. Loss Ratios (aka "Claims Ratios")

79. A loss ratio represents is a metric of an insurer's profitability that reflects the relationship between claims paid and premiums received.[14]

---

[14] *Understanding Loss Ratios*, INSURANCE TRAINING CENTER, https://insurancetrainingcenter.com/resource/loss-ratio/ (last visited Dec. 22, 2025) archived at https://perma.cc/UVC3-GRET.

20

80.     Specifically, a loss ratio is the insurance claims paid plus loss adjustment expenses divided by the premiums earned. "The lower the ratio, the higher the insurance company's profitability."[15] The higher the ratio, the better the insurance from the purchaser's perspective.

81.     A loss ratio above 1, or over 100%, means that the company is paying out more in claims than it is receiving in premiums.[16]

82.     For comparison purposes, the Affordable Care Act mandates that an employer-sponsored health plan maintained by an employer of Labcorp's size must achieve an 85% medical loss ratio ("MLR") – that is, for every $1 of premiums, the insurer must pay $0.85 in benefits.[17]

83.     This MLR requirement not only demonstrates the MLR that the federal government considers reasonable in an employer-paid plan, but also has prompted some insurers and brokers to focus on obtaining additional revenue through voluntary benefits insurance, which are not subject to the Affordable Care Act's MLR limitations.[18]

---

[15] *Id.*

[16] Donald Riggin, *What's in a Loss Ratio? More Than Meets the Eye!*, IRMI (May 1, 2011), https://www.irmi.com/articles/expert-commentary/whats-in-a-loss-ratio-more-than-meets-the-eye archived at https://perma.cc/X5VM-YL9J.

[17] *Medical Loss Ratio*, CENTERS FOR MEDICARE & MEDICAID SERVICES (Sept. 10, 2024), https://www.cms.gov/marketplace/private-health-insurance/medical-loss-ratio archived at https://perma.cc/9UQN-QHPA.

[18] Dave Willis, *Voluntary Benefits: Ten Things Brokers Do Right-And Ten They Do Wrong*, ROUGH NOTES, https://roughnotes.com/benefitsereport/archives/v29_february2013/BenefitsSpecialRepor t/page53.htm (last visited Dec. 22, 2025) archived at https://perma.cc/X8DT-P2LY.

84.    "Medigap" policies, which are private insurance policies that supplement Medicare, are required to have a loss ratio of at least 65% for individual policies and 75% for group policies.[19]

85.    Some state insurance laws similarly mandate loss ratios for certain insurances, which typically range from 55% to 85%.[20]

86.    In North Carolina, the minimum loss ratio for Medicaid policies is 88%. N.C. Gen. Stat. § 108D-65.

87.    A study of loss ratio data from the National Association of Insurance Commissioners concludes "that supplemental products return scant, and declining, compensation to consumers."[21]

88.    "When loss ratios drop below 50%, the principal purpose of the product is no longer spreading risk and compensating consumers, but perpetuation of sales for their own sake."[22]

89.    "[A] downward trend [in loss ratios] is evident across several categories of [voluntary benefit] products[.]"[23]

---

[19] U.S. GEN. ACCOUNTING OFFICE, *GAO/HEHS-95-151 – Medigap Insurance: Insurers' Compliance with Federal Minimum Loss Ratio Standards*, 1988-93 2 (1995).

[20] Suzanne M. Kirchhoff, *Medical Loss Ratio Requirements Under the Patient Protection and Affordable Care Act (ACA): Issues for Congress*, CONGRESSIONAL RESEARCH SERVICE, 22 (Aug. 26, 2014), https://sgp.fas.org/crs/misc/R42735.pdf archived at https://perma.cc/K6LK-FXQT.

[21] Jackson Williams, *Addressing Low-Value Insurance Products with Improved Consumer Information: The Case of Ancillary Health Products*, JOURNAL OF INSURANCE REGULATION 1, 18 (2023).

[22] *Id.*

[23] *Id.*

90.     Factors that decrease loss ratios in voluntary benefit plans include higher than necessary premiums, systemic claims denials, selling products to employees who do not need the products, poor communication (employees do not know they have claims when they do have claims), payments to the employer, and excessive compensation to the broker.

91.     That is not to say that supplemental or voluntary benefit plans are *per se* imprudent. However, given that such plans tend to have relatively low loss ratios and lack the minimum-loss-ratio guardrails imposed by the ACA, the need for employers to act vigilantly in monitoring service provider compensation takes on even greater importance in the voluntary-benefits context, as the employer's action or inaction in monitoring fees directly affects premiums, loss ratios, and the resulting value of the benefit to employees.

## II.     Voluntary Benefits Insurance in the Labcorp Plan

92.     The Plan had approximately 45,000 participants in 2019 and 54,000 participants at the end of 2024.

93.     Between 2019 and 2024, the Voluntary Benefits Insurance covered between approximately 22,000 and 95,000 lives (Labcorp employees and covered family members).

94.     The Plan's large size gives it enormous bargaining power to command lower broker fees and better deals on insurance premiums.

95.     The Plan is administered by WTW and carried by ReliaStar Life Insurance Company, a subsidiary of Voya Holdings, Inc.

23

96. The broker and insurance carrier for the Plan have been the same since 2019.

97. Although Plaintiffs do not have access to information about the fiduciary process that Labcorp used to select a carrier for the Voluntary Benefits Insurance, Labcorp's inaction raises a plausible inference that it did not obtain competitive bids since 2019 to determine if the marketplace offered a better value for the premium dollars of Labcorp's employees and Plaintiffs anticipate that a reasonable opportunity for discovery will reveal such inaction.

98. From 2019 to 2024, WTW was paid over $2 million in commissions each year related to the Voluntary Benefits Insurance policies.

99. WTW's actual compensation is likely higher than these amounts because WTW's known practices include collecting additional undisclosed compensation.

100. Premiums for the Voluntary Benefits Insurance in the Plan were paid solely by the employees and Labcorp collected and held the premium payments through employee salary deferrals, as shown on employee paystubs.

101. The Plan held premium payments collected from participants before remitting those funds to the insurance company.

A. <u>Labcorp breached its fiduciary duties by failing to diligently select and monitor voluntary benefits offerings and providers.</u>

102. At all relevant times, Labcorp acted as a fiduciary by administering the Voluntary Benefits Insurance, and selecting the brokers, carriers, and the particular voluntary insurance policies available to participants. *See Barbich v. Northwestern Univ.*,

24

No. 25-6849, 2026 LX 225061, at *10–11 (N.D. Ill. Apr. 2, 2026) (while the decision to offer a particular plan is a non-fiduciary function, "selecting the specific options for employees to enroll in" and monitoring those options was a fiduciary function).

103. At all relevant times, Labcorp was responsible for selecting and monitoring an insurance carrier for the Voluntary Benefits Insurance.

104. At all relevant times, Labcorp used a broker to select an insurance carrier for the Plan.

105. Labcorp allowed WTW to receive commissions related to the Voluntary Benefits Insurance of over $2 million per year since 2019, which far exceeded the reasonable market rate for WTW's services to the Plan and the rate paid by similar plans for the same services.

106. Although Plaintiffs do not have access to information about the fiduciary process that Labcorp used to monitor WTW's compensation, WTW's commissions are so large relative to its minimal services to the Plan that it is plausible to infer that Labcorp lacked a diligent process to monitor and assess the reasonableness of WTW's commissions and to assess whether the Voluntary Benefits Insurance was reasonably priced relative to other similar available coverage, and Plaintiffs anticipate that a reasonable opportunity for discovery will reveal such a flawed or non-existent fiduciary process.

25

107. Labcorp was necessarily aware that WTW was receiving commissions of over $2 million per year because Labcorp reported the commissions in the Plan's annual reports filed with the DOL.

B. Labcorp engaged in prohibited transactions when it caused WTW to receive excessive commissions from Plan assets.

108. Labcorp, as plan sponsor, and WTW, as a plan service provider, are parties in interest.

109. ReliaStar Life Insurance Company, as a plan service provider, is a party in interest.

110. Employee contributions to a plan constitute plan assets.

111. Premium dollars derived from participants' wage withholdings are plan assets, because, among other reasons, ERISA looks to their purpose, beneficial ownership, and continued economic connection to the Plan, not merely their physical location. *See, e.g.*, U.S. Dep't of Labor, Advisory Op. No. 93-14A (May 5, 1993) (plan assets will "include any property, tangible or intangible, in which the plan has a beneficial ownership interest," considering "any contract or other legal instrument involving the plan, as well as the actions and representations of the parties involved[.]").

112. By selecting and retaining WTW as broker for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to WTW as payment for premiums, Labcorp caused the Plan to engage in a transaction with WTW constituting an "exchange . . . of . . . property" between the Plan and a party in interest. 29 U.S.C. § 1106(a)(1)(A).

26

113. By selecting and retaining WTW as broker for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to WTW as payment for premiums, Labcorp caused the Plan to engage in a transaction with WTW constituting "furnishing of goods, services, or facilities between the plan and party in interest." 29 U.S.C. § 1106(a)(1)(C).

114. By selecting and retaining WTW as broker for the Voluntary Benefits Insurance, and by causing Plan assets to be used as payment for premiums, Labcorp caused the Plan to engage in a transaction with WTW constituting "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]" 29 U.S.C. § 1106(a)(1)(D).

115. As noted, WTW, consistent with its regular business practice, reduced Labcorp's bills for other WTW services in exchange for Labcorp allowing WTW to receive excessive commissions embedded in employees' premiums for Voluntary Benefits Insurance.

116. Thus, Labcorp likewise received improper benefits in connection with the excessive commissions charged to Plaintiffs in the Plan.

C. <u>WTW breached its fiduciary duties and engaged in prohibited transactions by causing excessive compensation to be paid to itself from the Plan or knowingly participated in Labcorp's ERISA violations.</u>

i. *WTW acted as a fiduciary.*

117. WTW acted as a fiduciary in taking the actions alleged herein related to the Plan.

27

118. Although merely selling insurance to a Plan, without more, does not automatically create a fiduciary relationship, WTW went beyond mere sales activities.

119. A broker is a fiduciary if it manages or controls an insurance policy which is an asset of the plan.

120. An insurance broker that selects an insurance carrier for an employee benefit plan is an ERISA fiduciary.

121. Similarly, where a broker selects or recommends a carrier for an employee benefits program, the broker acts in a fiduciary capacity.

> Where an insurance agent or broker acts as [an] agent for [the] insured, there is a fiduciary relationship between them, and the agent or broker has a fiduciary responsibility to [the] insured. Thus, an agent or broker employed to effect insurance for another, like other agents, owes to his principal the duty to discharge with loyalty and good faith the trust imposed in him, to obey the instructions given to him by [the] insured, and to exercise reasonable skill, care, and diligence in effecting the insurance.

*Chao v. Day*, 436 F.3d 234, 237 (D.C. Cir. 2006) (quoting 44 C.J.S. Insurance § 215).

122. Here, WTW acted as a fiduciary because it selected and recommended ReliaStar Life Insurance Company as the insurance carrier.

123. WTW also acted as a fiduciary by selectively withholding information from Labcorp about lower-cost voluntary benefits insurance options, in order to prevent WTW from having information sufficient to prudently manage the Voluntary Benefits Insurance plan, and to maximize WTW's compensation.

124. Additionally, WTW is a fiduciary because it was an agent for Labcorp and for the Plan in procuring and renewing insurance policies and managing claims.

28

125. As a direct result of WTW's exercise of its fiduciary authority in selecting and recommending insurance carriers, WTW received excessive commissions.

ii. *WTW knowingly participated in fiduciary violations.*

126. Even if WTW was not a fiduciary (and it is), WTW knowingly participated in Labcorp's ERISA violations and is therefore subject to equitable relief including disgorgement, restitution, and an accounting for profits.

127. As discussed, WTW and Labcorp evidently conspired to shift expenses to participants by allowing WTW to collect excessive commissions embedded in Voluntary Benefits Insurance premiums, the full cost of which was paid by employees, while reducing the expenses borne by Labcorp for WTW's services for traditional health insurance.

128. Accordingly, WTW had actual or constructive knowledge of the circumstances constituting Labcorp's breach of duty and rendering the transactions involving its Plan-related compensation prohibited by ERISA.

129. WTW knew that Labcorp was not acting solely in the interest of the participants or with even a modicum of care, skill, prudence, or diligence in overseeing the Voluntary Benefits Insurance.

130. WTW knew instead that Labcorp was acting to benefit itself and WTW by reducing its own bills in exchange for shifting WTW's excessive commissions entirely to Labcorp employees.

29

131. WTW knew that Labcorp was not monitoring WTW's compensation for reasonableness, but instead was allowing WTW to collect excessive compensation.

iii. *WTW received excessive and unreasonable compensation.*

132. Since 2019, WTW received a staggering $14 million in commissions from Labcorp's accident, critical illness, and hospital indemnity voluntary benefit programs, averaging 28.9% of premiums.

133. In other words, for every dollar a Labcorp employee spent on buying the one of the at-issue policies, 28 cents—28% (on average)—went to WTW as a commission.

134. There is no indication that WTW did anything to earn its $14 million in commissions, and WTW has remained Labcorp's broker for the Plan's Voluntary Benefits Insurance since 2019.

135. As discussed, after obtaining bids and selecting an insurer, a broker's workload usually declines and primarily consists of assisting employees with enrollment, a task usually outsourced to a third party at a cost of $4–10 per enrollee.

136. Here, there were between 23,000 to 95,000 enrollees in Labcorp's Voluntary Benefits Insurance policies each year from 2019 to 2024. Even at the high end, the cost to WTW of outsourcing enrollment of the maximum number of 95,000 enrollees at $10 per person would have been no more than $950,000, meaning at least $1 million of WTW's annual compensation was pure excess and unrelated to any services it provided to the Plan.

30

137. This is corroborated by the far lower broker commissions paid for voluntary insurance in similarly sized plans, approximately 10%. The commissions that WTW received are *more than 2.5 times* this amount.

138. WTW's compensation was not justified by exceptional quality of service, as its services are fungible and broker services of equal or better quality were readily available in the market at a far lower cost.

139. But even assuming *arguendo* that Labcorp reasonably believed that WTW possessed a unique service capability, that still would not have justified the exorbitant 28% commission rate because other voluntary benefits insurance plans that used WTW as broker paid a far lower commission rate, as shown *infra*.

140. Therefore, even if Labcorp reasonably decided that WTW was the best choice of broker for the Plan's Voluntary Benefits Insurance, it still could have obtained WTW's services at far lower cost through diligent negotiation in the interest of the Plan's participants instead of its own interests, as did the fiduciaries of similar plans.

141. Nor did the Plan's particular insurance product from ReliaStar Life Insurance Company justify WTW's excessive commission. There is nothing exceptional about the ReliaStar product to justify a far higher broker commission than that paid by other plans. In this highly competitive market, there are numerous insurance companies with equivalent or greater financial strength that are capable of providing the same benefit to participants—cash payments for specified events. Thus, Labcorp could have easily switched carriers with no material difference in the benefit to participants.

31

## III. Plan Participants' Injuries

142. Plaintiffs and other Plan participants were injured because they overpaid for premiums. *See Barbich*, 2026 LX 225061, at *9 ("The question is not whether the plaintiffs received the healthcare benefits they were promised. The question is instead whether, in receiving those benefits, they paid too much for them.").

143. The Plan was financially harmed because its assets were squandered on excessive premium payments that included unreasonable commissions paid to WTW.

144. WTW's $14 million in commissions since 2019 from Labcorp's accident, critical illness, and hospital indemnity voluntary benefit policies came directly out of Plan participants' premium payments.

145. Even though the typical broker commission for voluntary insurance for this size plan in the industry is approximately 10%, these averages are driven up by the presence of outliers, such as the Plan, where Defendants have allowed excessive commissions to be charged.

146. In fact, commissions of 2–8% are common in similar plans and available without any material difference in the scope or quality of services and no material difference between the insurance products.[24]

147. WTW's average commissions of over 25% have drastically impaired the loss ratio for purchasers of the Voluntary Benefits Insurance. Reducing the commissions necessarily would have improved the loss ratio and value to participants.

---

[24] Anderson, *How Does an Insurance Broker Make Money?*, *supra* note 9.

32

148. Based on reported industry averages and sources, and because the Plan is an extreme outlier in terms of excessive broker compensation, the estimated true historical loss ratio of the Voluntary Benefits Insurance during the applicable time period is significantly less than 50%, *i.e.*, participants and beneficiaries of the Voluntary Benefits Insurance received far less than 50 cents in benefits (on average) for every one dollar in premiums paid.

149. Broker commissions and administrative costs are paid – dollar for dollar – from premiums paid by participants.

150. Participants, accordingly, are directly financially harmed by paying excessive premiums caused by the unreasonable commissions paid to WTW.

151. By way of hypothetical example, if a participant pays $100 per month for a policy that should have a 60% loss ratio, but instead has a 30% average loss ratio, the participant suffers a direct, out-of-pocket loss of $30 per month. This is because the true value of the policy (which should be reflected as the premium) is $30 per month less than the actual premium paid.

152. Loss ratio is an "all-in" metric that accounts for variables such as quality of service. That is because better services (*e.g.*, enrollment, website, and claims processing) will result in more claims paid.

153. Poor or predatory service (*e.g.*, inadequate claims processing, poor customer support, lack of website portal, ineffective messaging, and unsuitable sales) results in fewer claims paid.

33

154. This does not mean that a loss ratio is the only thing a prudent employer should consider in evaluating or monitoring a voluntary benefit program. But it does mean that lower loss ratios are far more likely to correlate to poor value in terms of benefits received, as well as poor service quality.

155. Here, every Plan participant who was a purchaser of the Voluntary Benefits Insurance in the Plan during the applicable time period suffered a direct, out of pocket loss, because each such participant paid more than what the policy was worth and more than they would have paid if Defendants had acted lawfully by reducing WTW's commissions to a reasonable market rate.

156. As the loss ratio of the Voluntary Benefits Insurance is significantly less than 50%, Defendants' imprudent actions caused the loss ratio to decrease below a reasonable level.

157. Because broker commissions are paid dollar-for-dollar from premiums, every dollar of excessive commission collected by WTW is an out-of-pocket loss for Plaintiffs.

158. The commissions Defendants allowed WTW to collect from Plan participants, as outlined in the table below, dwarfed commissions collected by WTW that were reported by other similar plans in publicly available Form 5500 data.

34

| Year | Insured Persons | Premiums Paid | Broker Commissions and Fees | Commissions and Fees as a Percentage of the Premiums |
|---|---|---|---|---|
| 2019 | 34,164 | $ 5,207,237 | $2,866,747 | 55.05% |
| 2020 | 69,610 | $ 8,111,691 | $2,137,827 | 26.35% |
| 2021 | 22,953 | $ 9,313,423 | $2,173,074 | 23.33% |
| 2022 | 94,511 | $10,194,938 | $2,329,616 | 22.85% |
| 2023 | 84,927 | $10,124,933 | $2,406,034 | 23.76% |
| 2024 | 85,909 | $ 9,897,084 | $2,227,570 | 22.51% |
| | | | Total: $14,140,868 | Average: 28.89% |

*Table 1 – Commissions and Fees as a Percentage of the Premiums*

159. For example, the Broadcom Employee Benefits Plan reported WTW as its broker for its critical illness, accident insurance, and hospital insurance policies through ReliaStar Life Insurance Company from 2018 through 2024, covering between approximately 3,900 and 15,600 lives. WTW collected 2.6% or less in commissions each year, with an average amount (across the Plan's various Form 5500 filings) of 2.08%.

160. Similarly, the Home Depot Group Benefits Plan reported WTW as its broker for its critical illness policy through American Heritage Life Insurance Company from 2020 through 2022, covering between about 40,000 and 60,000 lives. WTW collected 5% or less in commissions each year, with an average amount (across the Plan's various Form 5500 filings) of 4.78%.

161. The Advocate Aurora Health Welfare Benefit Plan reported that WTW was the broker for its critical illness, accident, hospital indemnity, and compass care package (added in 2023) policies through ReliaStar Life Insurance Company from 2020 through 2024, covering between approximately 36,000 and 81,000 lives. WTW collected less than

35

13% in commissions and fees each year, with an average amount (across the Plan's various Form 5500 filings) of 12.08%.

162. The Mentor Network Welfare Benefits Plan reported WTW as its broker for its accident, critical illness, hospital indemnity, and individual excess risk composite policies (added in 2019) through ReliaStar Life Insurance Company from 2018 through 2023, covering between approximately 4,000 and 10,000 lives. WTW collected 12.5% or less in commissions and fees each year, with an average amount (across the Plan's various Form 5500 filings) of 8.32%.

163. In 2024, the Circle K Stores Employee Benefit Plan reported that Mercer Health and Benefits Administration, LLC ("Mercer") was the broker for its accident, critical illness, and hospital indemnity policies through the Guardian Life Insurance Company of America, covering over 4,800 lives. Mercer collected less than 6% in commissions and fees from participants in that plan.

164. Similarly, the PVH Corp. Welfare Benefits Plan reported that Mercer was the broker for its accident, critical illness, and hospital policies through Metropolitan Life Insurance Company in 2024, covering approximately 1,900 lives. Mercer only collected 2.1% in commissions and fees from participants in that plan.

165. The Kohl's Group Health Plan reported Mercer as its broker for its critical illness, accident, and hospital indemnity (added in 2020) policies through UnitedHealthcare Insurance Company from 2019 through 2024, covering between

36

approximately 4,800 and 12,800 lives. Mercer collected less than 19% commissions each year, with an average amount (across the Plan's various Form 5500 filings) of 10.1%.

166. In 2024 the Schaeffler Group USA Inc. Group Welfare Benefits Plan reported that Gallagher Benefit Services, Inc. ("Gallagher") was the broker for its accident, critical illness, and hospital indemnity policies through Lincoln National Life Insurance Company, covering between approximately 800 and 1,100 lives. For each of the three policies, Gallagher's reported commission never exceeded 6.52% of the premiums paid.

167. The Clarivate Analytics Health and Welfare Plan reported that Gallagher was the broker for its accident, critical illness, and hospital indemnity policies through Unum Insurance Company in 2023 and 2024, covering approximately 800 lives. Gallagher collected less than 7.4% in commissions both years, with an average amount of 5.8%.

168. In 2024, the Mannington Group Life and Health Insurance Plan reported that Gallagher was the broker for its accident, critical illness, and hospital indemnity offerings carried by Cigna Health and Life Insurance Company, covering approximately 2,000 lives. Gallagher only collected 9.2% of the premiums paid in commissions.

169. The Dollar Tree Inc. Group Health Benefit Plan reported Lockton Companies, LLC ("Lockton") and Alliant Insurance Services, Inc. as its brokers for its critical illness, accident, and hospital indemnity policies through Metropolitan Life Insurance Company in 2021 and 2022. It reported Lockton and BenefitFocus.Com as its

37

brokers for its critical illness, accident, and hospital indemnity policies through Unum Insurance Company from 2023 to 2024. From 2021 to 2024, the plan covered between approximately 16,000 and 22,000 lives. Together, the brokers collected less than 13.9% in commissions and fees each year, with an average amount (across the Plan's various Form 5500 filings) of 10.7%.

170. In 2024, the Owens & Minor Flexible Benefits Plan reported Lockton as its broker for its accident, critical illness, and hospital indemnity policies through Cigna Health and Life Insurance Company, covering over 4,500 lives. Lockton only collected 9.4% in commissions.

171. Other plans reported policies in which no broker received any commission for the policies according to their plan's Form 5500s.

172. For example, the Renesas Electronics America Inc. Benefit Plan reported no broker commissions or fees for its accident, critical illness, and hospital indemnity policies through Aetna Life Insurance Company from 2022 through 2024, covering between approximately 1,800 and 2,100 lives.

173. The Target Corporation Employee Umbrella Welfare Benefit Plan reported no broker commissions or fees for its accident, critical illness, and hospital indemnity policies through American Heritage Life Insurance Company for 2020 to 2023, covering between approximately 25,300 and 37,000 lives.[25]

---

[25] In 2019, Aon Consulting Inc. collected a total of $214 in commissions and fees as broker for the plan's accident, critical illness, and hospital indemnity policies. The

38

174. The VMware, Inc. Group Health and Welfare Plan reported no broker commissions or fees for its accident, critical illness, and hospital indemnity policies through ReliaStar Life Insurance Company in 2023, covering approximately 13,000 lives. While VMware, Inc. Group Health and Welfare Plan did report Woodruff-Sawyer & Co. as its broker in 2021 and 2022, it collected less than 4.5% in commissions for those years.

175. There was no material difference in the scope or quality of brokerage services received by the above plans and those received by the Plan from WTW.

176. The cost of coverage depends in part on the risk of loss and the amount of benefits.

177. Insurance premiums may rely on complex actuarial calculations that depend on the demographics of a workforce, the employer's industry, the size of the workforce, and benefits offered.[26]

---

commissions collected by Aon are a mere .002% of the approximately $10 million in premiums paid by participants across all three offerings in 2019. In 2024, the plan reported Pacific Resources Bnft Adv LLC as its broker, who collected approximately 1.9% in commissions and fees for that year.

[26] Greg Fann, *The True Cost of Coverage*, THE ACTUARY (Jan. 2016), https://www.theactuarymagazine.org/the-true-cost-of-coverage/ ("In many states, issuers developed unique benefit designs, set their own rating factors, and may have considered underwriting factors for health status and claims experience in determining the premium rates offered to an individual purchaser.") archived at https://perma.cc/372K-HYFR; *How are Health Insurance Premiums Calculated? Learn Factors & Costs*, Take Command (May 16, 2024), https://www.takecommandhealth.com/blog/blog/how-health-insurance-premiums-are-calculated/ ("Health insurance premiums are calculated based on risk pools, groups of individuals whose medical costs are combined to calculate average expenses. Insurers use historical data and statistical algorithms to estimate the amount of money they will need to pay out for claims, adding a margin to ensure profitability and cover administrative expenses.") archived at https://perma.cc/NKQ7-8ERF.

39

178. Therefore, if a comparison of the amount of premiums in two plans does not take into account the amount of benefits and the risk of loss, it may be an apples-to-oranges comparison.

179. For example, a plan covering a comparatively younger and healthier employee population may have a lower overall premium than one covering an older workforce despite an excessive commission being embedded in the premium paid by the younger group. That in no way eliminates the harm from the excessive commission, because the employees still paid more than they would have and should have if the employer had diligently negotiated for a reasonable commission, thereby reducing the premium by the same amount.

180. Comparison of loss ratios *is* an apples-to-apples comparison, because it is simply the measure of the ratio between cost (premium) and the value of benefits paid.

181. Similarly, because commissions represent one component of the costs that must be accounted for in the loss ratio, and are paid for dollar-for-dollar out of premiums, comparison of commissions *is* an apples-to-apples comparison.

182. WTW collected an average of over 28% in commissions, over $2 million each and every year from 2019 through 2024.

183. Because over 28% of Plan participants' premiums were earmarked to pay brokers instead of benefits, the Voluntary Benefits Insurance was necessarily an inferior value for policyholders than it would have been if the commissions were reduced, which would have reduced premiums and increased value.

184. Many other plans listed above paid brokers far less than the Plan, including numerous plans paying commissions of less than 12% of premiums.

185. When commissions are lower, premiums are lower, and a greater share of premiums is allocated to pay benefits, resulting in a better value for insureds.

186. Defendants were obligated to ensure that Plan participants did not pay excessive and unreasonable commissions.

187. Had Labcorp exercised the due diligence required in carrying out its ERISA-imposed fiduciary duties of prudence and loyalty, it would have monitored and reduced WTW's commissions to the levels paid by other comparable plans, thereby lowering, on a dollar-for-dollar basis, premiums paid by Plaintiffs and the proposed class.

## CLASS ACTION ALLEGATIONS

188. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

189. Section 1132(a)(3) similarly authorizes any participant or beneficiary to bring an action for appropriate equitable relief not covered by § 1132(a)(2).

190. In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all affected participants and

41

beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Laboratory Corporation of America Holdings Group Benefits Plan enrolled in an accident, critical illness, and/or hospital indemnity policy from December 23, 2019, through the date of judgment, excluding the Defendants.

191. This action meets the requirements of Federal Rule of Civil Procedure 23 and is certifiable as a class action for the following reasons:

    a. The class includes thousands of members and is so large that joinder of all its members is impracticable.

    b. There are questions of law and fact common to the class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; whether the fiduciaries engaged in prohibited transactions with Plan assets; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches of duty.

    c. Plaintiffs' claims are typical of the claims of the class because Plaintiffs were participants during the relevant time period and all participants in

42

the Plan enrolled in the voluntary benefit policies were harmed by Defendants' misconduct.

d. Plaintiffs are adequate representatives of the class because they were participants in the Plan and enrolled in voluntary benefit policies during the class period, have no interest that is in conflict with any other member of the class, are committed to the vigorous representation of the class, and have engaged experienced and competent attorneys to represent the class.

e. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (i) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (ii) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

192. A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and

43

impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

193. Plaintiffs' counsel, Schlichter Bogard LLC, will fairly and adequately represent the interests of the class and is best able to represent the interests of the class under Rule 23(g). The firm has vast experience in the area of ERISA fiduciary breach litigation and has been appointed class counsel in over 45 ERISA fiduciary breach actions.

194. Dating back to 2006, the firm has a well-established track record of success in vigorously pursuing the rights of ERISA plan participants. Before the firm filed the first 401(k) excessive fee case under ERISA, no law firm in the United States had ever filed such a claim. The firm was the first to try an ERISA excessive fee case and successfully obtain a judgment on behalf of plan participants. *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 45240 (W.D. Mo. Mar. 31, 2012). After multiple appeals to the Eighth Circuit and remands to the district court, and over 25,000 hours of attorney and paralegal time, the parties ultimately settled the action in 2019, almost 14 years after filing. *Tussey v. ABB, Inc.*, No. 06-4305, 2019 U.S. Dist. LEXIS 138880, at *4 (W.D. Mo.

44

Aug. 16, 2019). Judge Laughrey noted in that case, "[i]t is well established that complex ERISA litigation involves a national standard and special expertise. Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428, at \*9–10 (W.D. Mo. Nov. 2, 2012), *rev'd on other grounds*, 746 F.3d 327 (8th Cir. 2014) (citations omitted).

195.    *Tibble v. Edison International* is another example of the firm's unwavering efforts to protect the rights of ERISA plan participants. After a dismissal upheld by the Ninth Circuit, the firm successfully petitioned the Supreme Court and obtained a unanimous decision in the Supreme Court, reversing the Ninth Circuit. *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). This was the first ever 401(k) ERISA excessive fee case in the Supreme Court. This was a landmark decision in ERISA litigation. Thereafter, sitting *en banc*, ten judges of the Ninth Circuit on remand unanimously vacated a Ninth Circuit panel decision and remanded to the district court to determine whether the defendants violated their continuing duty to monitor the 401(k) plan's investments, stating that "cost-conscious management is fundamental to prudence in the investment function." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (citation omitted). Following remand, in August 2017, the plaintiffs obtained a judgment of $13.4 million in plan losses and lost investment opportunity. *Tibble v. Edison Int'l*, No. 07-5359, 2017 U.S. Dist. LEXIS 130806 (C.D. Cal. Aug. 16, 2017); *Tibble*, ECF 570, 572.

196.    In 2016, after over a year of investigation of 403(b) plans, Schlichter Bogard filed a group of cases on behalf of employees and retirees against major national

universities involving claims of excessive fees in 403(b) plans. These were also the first of their kind against 403(b) plan sponsors. 403(b) plans are defined contribution retirement plans for non-profit organizations. Employers in such plans have the same fiduciary duties as employers in 401(k) plans.

197. Schlichter Bogard asked the Supreme Court to take a 403(b) plan excessive fee case that had been dismissed and was again successful in the Supreme Court in its second-ever ERISA excessive fee case. In *Hughes v. Northwestern University*, 595 U.S. 170 (2022), the Supreme Court ruled in plaintiffs' favor, holding that the inclusion of prudent options in a plan does not offset the inclusion of imprudent ones, and that a plan sponsor must monitor each fund in a plan and remove those that are imprudent. Again, the Supreme Court's decision was unanimous.

198. And when Schlichter Bogard asked the Supreme Court to take its third-ever ERISA case, another 403(b) plan excessive fee case, it was once again successful. In *Cunningham v. Cornell Univ.*, 604 U.S. 693 (2025), the Supreme Court *again* unanimously ruled in plaintiffs' favor, holding that to plausibly allege a prohibited transaction, plaintiffs' need not plead around exemptions under ERISA.

199. Indeed, the firm's efforts have "led to enormous fee savings for plan participants." *Cates v. Trs. of Columbia Univ.*, No. 16-06524, 2021 U.S. Dist. LEXIS 200890, at *15–16 (S.D.N.Y. Oct. 18, 2021) (noting that Schlichter Bogard's "fee litigation and the Department of Labor's fee disclosure regulations approach $2.8 billion in annual savings for American workers and retirees") (citation omitted).

46

200.    With these efforts, the firm is recognized "as a pioneer and the leader in the field" of ERISA retirement plan litigation, *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4–5 (S.D. Ill. July 17, 2015), and "clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428, at *10 (W.D. Mo. Nov. 2, 2012).

201.    In *Beesley v. International Paper*, a 401(k) ERISA excessive fee case that resulted in a settlement of $30 million plus substantial affirmative relief following seven years of litigation, Judge David Herndon observed: "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination. [Schlichter Bogard's] diligence and perseverance, while risking vast amounts of time and money, reflect the finest attributes of a private attorney general." No. 06-703, 2014 U.S. Dist. LEXIS 12037, at *8 (S.D. Ill. Jan. 31, 2014).

202.    In *Will v. General Dynamics*, another ERISA excessive fee case, Judge Patrick Murphy found that litigating the case and achieving a successful result for the class "required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans." No. 06-698, 2010 U.S. Dist. LEXIS 123349, at *9 (S.D. Ill. Nov. 22, 2010).

203.    Judge Harold Baker, in *Nolte v. Cigna*, stated that Schlichter Bogard is the "preeminent firm in 401(k) fee litigation" and has "persevered in the face of the enormous

47

risks of representing employees and retirees in this area." No. 07-2046, ECF 413 at 1, 5 (C.D. Ill. Oct. 15, 2013).

204.    In approving a settlement including $32 million plus significant affirmative relief in a 403(b) excessive fee case, Chief Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, ECF 61 at 7–8 (M.D.N.C. Sept. 29, 2016), found that "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

205.    After recognizing "their persistence and skill of their attorneys," Judge Nancy Rosenstengel similarly noted:

> Class Counsel has been committed to the interests of the participants and beneficiaries of Boeing's 401(k) plan in pursuing this case and several other 401(k) fee cases of first impression. The law firm [Schlichter Bogard] has significantly improved 401(k) plans across the country by bringing cases such as this one[.]

*Spano v. Boeing Co.*, No. 06-743, 2016 U.S. Dist. LEXIS 161078, at *9 (S.D. Ill. Mar. 31, 2016).

206.    Judge Catherine Eagles noted that "these [ERISA] cases require a high level of skill on behalf of plaintiffs to achieve any recovery." *Clark v. Duke*, No. 16-1044, 2019 U.S. Dist. LEXIS 105696, at *9 (M.D.N.C. June 24, 2019). Judge Eagles concluded that "Class Counsel has demonstrated diligence, skill, and determination in this matter and, more generally, in an area of law in which few attorneys and law firms are willing or capable of practicing." *Id.* at *11.

48

207. The Honorable George L. Russell, III noted that Schlichter Bogard's "work on behalf of participants in large 401(k) and 403(b) plans has significantly improved these plans, brought to light fiduciary misconduct that has detrimentally impacted the retirement savings of American workers, and dramatically brought down fees in defined contribution plans." *Kelly v. Johns Hopkins Univ.*, No. 16-2835, 2020 U.S. Dist. LEXIS 14772, at *4 (D. Md. Jan. 28, 2020). Judge Russell continued, "[w]ithout the unique and unparalleled foresight for this novel area of litigation by [Schlichter Bogard], the class would not have obtained any recovery for the alleged fiduciary breaches that affected the Johns Hopkins University 403(b) plan for years prior." *Id.* at *11.

208. In *Cates v. Trustees of Columbia University*, Judge George B. Daniles noted that Schlichter Bogard's "fee litigation and the Department of Labor's fee disclosure regulations approach $2.8 billion in annual savings for American workers and retirees." No. 16-06524, 2021 U.S. Dist. LEXIS 200890, at *15–16 (S.D.N.Y. Oct. 18, 2021) (citation omitted).

209. In many of these cases, settlements were reached only after years of litigation and after Schlichter Bogard conducted extensive discovery, defeated motions to dismiss and for summary judgment, obtained class certification, and, in some, handled one or more interlocutory appeals. Examples, in addition to the 12-year history of *Tussey v. ABB*, *supra*, and nearly 14-year history of *Tibble v. Edison International*, *supra*, include *Spano v. Boeing Co.*, No. 06-743 (S.D. Ill.) (nine years of litigation including a Seventh Circuit appeal) and *Abbott v. Lockheed Martin Corp.*, No. 06-701 (S.D. Ill.) (eight years of litigation including

49

a Seventh Circuit appeal). ERISA fiduciary breach class actions involve tremendous risk and require review and analysis of thousands of documents, finding and obtaining opinions from expensive, unconflicted, consulting and testifying national experts in finance, investment management, fiduciary practices, recordkeeping practices, and related fields, and are extremely hard-fought and well-defended.

210. The firm's work in ERISA class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, Wall St. J. (May 15, 2016); Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. Times (Mar. 29, 2014); Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, Wall St. J. (Feb. 23, 2015); Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. Times (Oct. 16, 2014); Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, Wall St. J. (Aug. 25, 2015); Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, Wall St. J. (May 18, 2015); Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014); Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, Reuters (May 1, 2014); Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, Bloomberg (Oct. 2, 2014).

## CAUSES OF ACTION

## COUNT I: BREACH OF FIDUCIARY DUTY

211. Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

50

212. This Count alleges breach of fiduciary duties against all Defendants.

213. Defendants were required to discharge their duties with respect to the Plan solely in the interest of and for the exclusive purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

214. Prudent fiduciaries monitor compensation of *all* plan service providers, to ensure those service providers are receiving only reasonable compensation for services to the plan.

215. This includes indirect compensation, which is "compensation received from *any source other than the covered plan*, the plan sponsor, the covered service provider, or an affiliate." 29 C.F.R. § 2550.408b-2 (c)(viii)(B)(2)(emphasis added).

216. "Fiduciaries must . . . understand and monitor plan expenses." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019).

217. ERISA requires a fiduciary to defray the reasonable expenses of administering the plan. 29 U.S.C. § 1104(a)(1)(A); *see also Tibble*, 843 F.3d at 1197 ("[A] trustee is to incur only costs that are reasonable in amount[.]" (citations and quotation marks omitted)).

218. Fiduciaries must "be vigilant in 'negotiation of the specific formula and methodology' by which fee payments . . . [']will be credited to the plan and paid back to the plan or to plan service providers.'" *Sweda*, 923 F.3d at 328 (quoting DOL Advisory Opinion 2013-03A, 2013 ERISA LEXIS 3, *10).

51

219. Defendants failed to use an adequate fiduciary process to monitor and control premiums or broker commissions for the Voluntary Benefits Insurance.

220. Defendants failed to adequately monitor the amount of broker commissions and determine if those amounts were competitive or reasonable for the services provided to the Plan.

221. Defendants failed to use competitive bidding or leverage the Plan's size to reduce premiums or broker fees.

222. Defendants acted in their own self-interest by shifting WTW's commissions to participants while reducing Labcorp's bills for other services.

223. The conduct described above constituted a breach of fiduciary duties of prudence and loyalty. *See* 29 U.S.C. § 1104(a)(1)(A)–(B).

224. Each Defendant is jointly and personally liable to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. See 29 U.S.C. §§ 1109(a), 1132(a)(3).

225. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## COUNT II: FAILURE TO MONITOR FIDUCIARIES
### (28 U.S.C. § 1104(A)(1)(a)(ii))

226. Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

227. This Count alleges breach of fiduciary duties against Labcorp.

228. Labcorp is the Plan Administrator of the Plan under 29 U.S.C. § 1002(16)(A)(iii) and (21)(A) and a named fiduciary under 29 U.S.C. § 1102(a) with overall authority to control and manage the operation and administration of the Plan.

229. Labcorp delegated certain of its fiduciary responsibilities for administrative matters to WTW and to John Does 1–20. Having delegated those duties, Labcorp remained responsible for monitoring its delegees, WTW and John Does 1–20, to ensure that the delegated tasks were being performed prudently and loyally.

230. Appointing a fiduciary is a fiduciary act. *Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 569 (7th Cir. 1991); *Hickman v. Tosco Corp.*, 840 F.2d 564, 566 (8th Cir. 1988); *Erickson v. Born*, No. 17-1176, 2017 U.S. Dist. LEXIS 140804, at *6 (D. Minn. Aug. 31, 2017); *Howell v. Motorola, Inc.*, 633 F.3d 552, 562 (7th Cir. 2011) ("[A] company can be a plan fiduciary when there is evidence that it played a role in appointing the administrators of the plan (and thus had a duty to choose appointees wisely and to monitor their activities).").

231. If a monitoring fiduciary knows or should know that the monitored fiduciaries are not properly performing their fiduciary obligations, the monitoring fiduciary must take prompt and effective action to protect the plan and participants.

53

232. Defendant Labcorp breached its fiduciary monitoring duties by, among other things:

a. Failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

b. Failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach;

c. Failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Voluntary Benefits Insurance, ensuring that the commissions, premiums, and loss ratios were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's service providers; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan; and

d. Failing to remove appointees whose performance was inadequate.

233. Had Defendant Labcorp discharged its fiduciary monitoring duties prudently as described above, the Plan would not have suffered these losses. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, the Plaintiffs, and the other Class members, lost tens of millions of dollars.

54

## COUNT III: PROHIBITED TRANSACTIONS
### (29 U.S.C. § 1106(a)(1))

234.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

235.    This Count alleges prohibited transactions committed by Labcorp.

236.    As a provider of services to the Plan, WTW is a party in interest. 29 U.S.C. § 1002(14)(B).

237.    As provider of services to the Plan, including underwriting and claims adjudication, ReliaStar Life Insurance Company is a party in interest. 29 U.S.C. § 1002(14)(B).

238.    "A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—(A) sale or exchange, or leasing, of any property between the plan and a party in interest[.]" 29 U.S.C. § 1106(a)(1)(A).

239.    "A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect— . . . (C) furnishing of goods, services, or facilities between the plan and party in interest[.]" 29 U.S.C. § 1106(a)(1)(C).

240.    "A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect— . . . (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]" 29 U.S.C. § 1106 (a)(1)(D).

55

241. By selecting and retaining WTW as the broker for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to WTW as payment for premiums and/or commissions, Labcorp caused the Plan to engage in a transaction with WTW constituting an "exchange . . . of . . . property" between the Plan and a party in interest. 29 U.S.C. § 1106(a)(1)(A).

242. By selecting and retaining WTW as the broker for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to WTW as payment for premiums and/or commissions, Labcorp caused the Plan to engage in a transaction with WTW constituting "furnishing of goods, services, or facilities between the plan and party in interest[.]" 29 U.S.C. § 1106(a)(1)(C).

243. By selecting and retaining WTW as broker for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to WTW as payment for premiums and/or commissions, Labcorp caused the Plan to engage in a transaction with WTW constituting "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]" 29 U.S.C. § 1106 (a)(1)(D).

244. Total losses to the Plan will be determined after complete discovery in this case and are continuing.

245. Under 29 U.S.C. § 1109(a), Labcorp is personally liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and is subject to other appropriate equitable or remedial relief.

## COUNT IV: PROHIBITED TRANSACTIONS
### (29 U.S.C. § 1106(b))

246. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

247. This Count alleges prohibited transactions were committed by WTW.

248. "A fiduciary with respect to a plan shall not . . . deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1).

249. "A fiduciary with respect to a plan shall not . . . receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3).

250. As a Plan fiduciary, by collecting excessive commissions and other payments from Plan assets in connection with the Voluntary Benefits Insurance, WTW dealt with assets of the Plan in its own interests and received consideration for its own personal account in connection with a transaction involving Plan assets, in violation of 29 U.S.C. § 1106(b).

251. Total losses to the Plan will be determined after complete discovery in this case and are continuing.

252. Under 29 U.S.C. § 1109(a), WTW is personally liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

253. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

254. This Count alleges that WTW is liable as a knowing participant in Labcorp's fiduciary breaches.

255. Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. Fiduciary status is not a prerequisite to liability. A nonfiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

256. The Plan's fiduciaries owed a duty of prudence to the Plan and its participants and beneficiaries, which they violated, as alleged herein.

257. A "participant, beneficiary, or fiduciary may bring suit against an 'other person' under" 29 U.S.C. § 1132(a)(3) who "'knowingly' participates in a fiduciary's violation." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 248–49 (2000).

258. "To state a claim [for knowing participation in a fiduciary breach], plaintiffs must establish that an ERISA fiduciary breached its duty, that defendants knowingly participated in the breach, and damages. . . . 'Knowing participation' includes: (1) knowledge of the primary violator's status as a fiduciary, and (2) knowledge that the primary violator's conduct contravenes a fiduciary duty." *Romano v. Verizon Communs.,*

*Inc.*, 01-6737, 2002 U.S. Dist. LEXIS 5135, at \*11 n.1 (S.D.N.Y. Mar. 26, 2002) (citations omitted).

259.    A "non-fiduciary need only have actual or constructive notice that they participated in a breach of fiduciary duty." *Carfora v. Teachers Ins. Annuity Ass'n of Am.*, No. 21-8384, 2023 U.S. Dist. LEXIS 148435, at \*33 (S.D.N.Y. Aug. 21, 2023); *see also Fish v. Greatbanc Trust Co.*, 109 F. Supp. 3d 1037, 1041 (N.D. Ill. 2015).

260.    WTW knew that its own course of conduct described herein was unlawful. WTW also knew of the circumstances that rendered the Plan sponsor's conduct a breach of fiduciary duties and the circumstances that rendered the transactions involving their services and transfers and use of Plan assets unlawful.

261.    WTW knew that the Plan's fiduciaries were failing to monitor and control premiums or broker commissions for the Voluntary Benefits Insurance, failing to monitor the amount of broker commissions and determine if those amounts were competitive or reasonable for the services provided to the Plan, and failing to use competitive bidding or leverage the Plan's size to reduce premiums or broker fees.

262.    WTW knew that it and Labcorp improperly shifted WTW's excessive commissions to participants in exchange for reducing other Labcorp bills.

263.    As a result of their own misconduct and the Plan sponsor's ERISA violations, WTW knowingly received ERISA plan assets or improper profits derived from ERISA plan assets. Those assets and profits rightfully belong to Plaintiffs and class members.

59

264. Thus, even if WTW was not an ERISA fiduciary, it is subject to equitable remedies under 29 U.S.C. § 1132(a)(3), such as restitution, disgorgement, or a constructive trust.

## COUNT VI: KNOWING PARTICIPATION IN PROHIBITED TRANSACTIONS
### (29 U.S.C. §§ 1106(a)(1), 1132(a)(3))

265. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

266. This Count alleges that WTW is liable as a knowing participant in Labcorp's prohibited transactions.

267. The Plan's fiduciaries were bound by ERISA's prohibited transactions provisions, which render *per se* unlawful certain transactions between the Plan and party-in-interest service providers like WTW.

268. A nonfiduciary knowing participant is liable for participating in a prohibited transaction if it was a party to that transaction and "had actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Tr.*, 530 U.S. at 251.

269. WTW knew that its own course of conduct described herein was unlawful. WTW also knew of the circumstances that rendered the transactions involving its services and transfers and use of Plan assets was unlawful.

270. WTW knew that by selecting and retaining WTW as broker for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to WTW as payment for premiums and/or commissions, Labcorp caused the Plan to engage in a

60

transaction with WTW constituting an "exchange . . . of . . . property" between the Plan and a party in interest. 29 U.S.C. § 1106(a)(1)(A).

271. WTW knew that by selecting and retaining WTW as broker for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to WTW as payment for premiums and/or commissions, Labcorp caused the Plan to engage in a transaction with WTW constituting "furnishing of goods, services, or facilities between the plan and party in interest." 29 U.S.C. § 1106(a)(1)(C).

272. Labcorp knew that by selecting and retaining WTW as broker for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to WTW as payment for premiums and/or commissions, Labcorp caused the Plan to engage in a transaction with WTW constituting "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D).

273. As a result of their own misconduct and the Plan sponsor's ERISA violations, WTW knowingly received ERISA plan assets or improper profits derived from ERISA plan assets. Those assets and profits rightfully belong to Plaintiffs and class members.

274. Thus, even if WTW was not an ERISA fiduciary, it is subject to equitable remedies under 29 U.S.C. § 1132(a)(3), such as restitution, disgorgement, or a constructive trust.

## JURY TRIAL DEMANDED

275. Pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury on all issues so triable in this action and, alternatively, an advisory jury.

## PRAYER FOR RELIEF

276. For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

a. find and declare that Defendants have breached their fiduciary duties as described above and engaged in prohibited transactions as described above;

b. find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each ERISA violation described above, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

c. order the disgorgement of all assets and profits obtained by Defendants as a result of each violation of ERISA described above;

d. order an accounting for profits as needed to provide relief;

e. order the reversal of all non-exempt prohibited transactions;

f. determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

g. order Defendants to provide all information necessary to determine the amounts Defendants must make good to the Plan under § 1109(a);

62

h. remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

i. surcharge the Defendants in favor of the Plan or affected participants for the full amount of any improper, unreasonable, or otherwise illegal payments;

j. reform the Plan to include only prudent voluntary insurance;

k. certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter Bogard LLC as Class Counsel;

l. award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

m. order the payment of interest to the extent it is allowed by law; and

n. grant other equitable or remedial relief as the Court deems appropriate.

July 6, 2026

Respectfully submitted,

/s/ Andrew D. Schlichter
Andrew D. Schlichter
Alexander L. Braitberg
Patrick R. Kutz
Kaitlin Minkler
SCHLICHTER BOGARD LLC
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
(314) 621-6115
(314) 621-5934 (fax)
aschlichter@uselaws.com
abraitberg@uselaws.com
pkutz@uselaws.com
kminkler@uselaws.com

63

Ruben R. Chapa
SCHLICHTER BOGARD LLC
33 North Dearborn Street, Suite 1170
Chicago, IL 60602
(630) 919-9301
(314) 621-5934 (fax)
rchapa@uselaws.com

*Proposed Lead Class Counsel*

/s/ Steven A. Lucente
Steven A. Lucente
N.C. Bar No.: 39869
TLG Law
2907 Providence Rd., Suite 303
Charlotte, North Carolina 28211
slucente@tlg-law.com

*Local Counsel for Plaintiffs*

64